

**FILED**

**NOV 1 3 2013**

CLERK

IN UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

---

| | |
|---|---|
| BETHANY KARR,<br>as Special Administrator of the Estate of<br>Charleen Karr on behalf of the Estate<br>and on behalf of the Next-of-Kin of Charleen<br>Karr, Deceased,<br><br>      Plaintiff,<br><br>  vs.<br><br>CORRECT CARE SOLUTIONS, LLC (CCS),<br>A Foreign Limited Liability Company<br>authorized to do business in South Dakota;<br>AMANDA STURGEON;<br>SARAH MOLLOY;<br>STEPHANIE THEOBALD;<br>JULIE HAGEN; and<br>MINNEHAHA COUNTY, SOUTH DAKOTA,<br>d/b/a The MINNEHAHA COUNTY<br>DETOXIFICATION CENTER,<br><br>      Defendants. | COURT FILE NO. C IV 13-4132<br><br><br><br><br>**COMPLAINT** |

---

COMES NOW the PLAINTIFF, BETHANY KARR, as the Special Administrator of the

Estate of Charleen Karr, on behalf of the Estate, and on behalf of the Next-of-Kin of Charleen

Karr, Deceased, by and through her attorneys, Nasser Law Offices, PC, and for her causes of

action against Defendants, complains and alleges as follows:

### PARTIES, JURISDICTION, AND VENUE

1. This action is brought pursuant to 42 U.S.C. § 1983, et seq. (hereinafter, "§ 1983"),

and SDCL §§ 20-9-1 and 21-5-1. Pursuant to 28 U.S.C. § 1331, this court has original

jurisdiction over the § 1983 civil actions arising under the laws of the United States. Pursuant to 28 U.S.C. § 1367, this court has supplemental jurisdiction over the SDCL §§ 20-9-1 and 21-5-1 state-law based civil causes of action as claims that are so related to the § 1983 action(s) that they form part of the same case or controversy.

2. Pursuant to 28 U.S.C. § 1391(b)(2), venue is proper in that all, or a substantial part of the acts and omissions forming the basis of these claims, occurred in the Southern Division of the District of South Dakota, specifically Sioux Falls, Minnehaha County, South Dakota, on or about November 18, 2012.

3. Plaintiff's Decedent, Charleen Karr (hereinafter "Karr"), was at all times pertinent hereto a resident of Sioux Falls, Minnehaha County, South Dakota at the time of her death on November 18, 2012, which death occurred in Sioux Falls, Minnehaha County, South Dakota. Bethany Karr, the natural daughter of Karr and a resident of Sioux Falls, has been appointed as the Special Administrator for her mother by the Circuit Court, Second Judicial Circuit of South Dakota in Pro.13-12, as filed in the office of the Minnehaha County, South Dakota Clerk of Courts. Karr died leaving Next-of-Kin.

4. Defendant, Correct Care Solutions, LLC ("CCS"), was at all times pertinent hereto, a Foreign Limited Liability Company organized under the laws of Kansas, which provided third party professional medical and nursing care services in the Minnehaha County Detoxification Center ("Detox Center") under contract for said services with the owner thereof, Minnehaha County, South Dakota ("County").

5. Individual Defendants, Stephanie Theobald, Amanda Sturgeon, Julie Hagen, and Sarah Molloy, at all times pertinent hereto were employees of CCS. Stephanie Theobald and

Amanda Sturgeon are "detox technicians"; Julie Hagen is a BPN (Bachelor of Psychiatric Nursing) and Sarah Molloy is an LPN (Licensed Practical Nurse) who worked in their respective patient-care capacities for CCS at the Detox Center (collectively, "Detox Center Caregivers").

6.  Defendant County of Minnehaha ("County") is, and at all times pertinent hereto, was a political subdivision of the State of South Dakota. The Detox Center is a facility that is owned and operated by Minnehaha County, South Dakota, for the purpose of providing safe medical detoxification services including evaluation and monitoring of patients' condition and medical needs as well as providing necessary medical care required during the detoxification of patients who present to or are presented (generally by Law Enforcement) to the Detox Center.

## GENERAL ALLEGATIONS - FACTUAL BACKGROUND
## TIMELINE OF RELEVANT EVENTS

7.  On November 18, 2012, at approximately 5:00 p.m., Charleen Karr called the 211 Helpline to report that she had recently consumed approximately "4 ounces so far" of isopropyl "rubbing" alcohol along with her daily dose of Zoloft and Metformin, a prescription drug used to treat diabetes, and wanted to know if she needed medical help because of this ingestion. Karr was tearful and distraught, and answered the Helpline's inquiry as to whether her actions had been a suicide attempt, "Probably." The 211 Helpline advised Karr she would need medical attention and notified Metro Communications to report a female who had consumed isopropyl alcohol in an apparent suicide attempt, and requested that personnel be sent to perform a health and welfare check on Karr. Metro Communications notified and dispatched Sioux Falls Fire and Rescue, Sioux Falls Police Department, and Rural Metro Ambulance.

8.  At approximately 5:08 p.m., Sargeant David Osterquist (Osterquist) of the Sioux Falls

Police Department arrived on scene at Karr's residence. He found her sitting outside in her yard, holding the subject bottle of rubbing alcohol and talking on the phone with 211 Helpline. Osterquist spoke with 211 and confirmed that Karr's actions should be treated as a suicide attempt. Shortly thereafter, Osterquist witnessed Karr continue to drink from the bottle, at which point he knocked it out of her hand.

9. Karr was clearly emotionally distraught and was crying. Osterquist attempted to console her by assuring Karr she would get the medical attention she needed when the ambulance arrived and told Karr that he believed she would be taken to the hospital because she had consumed rubbing alcohol.

10. At approximately 5:26 p.m., Sioux Falls Police Officer Patrick Mertes and Rural Metro Ambulance arrived at Karr's residence.

11. Officer Mertes and Rural Metro Ambulance emergency responder Jeff Kauffman (EMT Kauffman) approached Osterquist and Karr to discuss the situation. During the discussion, EMT Kauffman picked up the bottle of isopropyl alcohol from the ground and read the warning label which contained instructions to seek medical attention and/or contact Poison Control if ingested. At this point in time, Karr was standing and ambulatory without signs of severe toxic poisoning. Though Karr was emotionally distraught, she was coherent and not in any apparently acute physical distress at this time.

12. Shortly before 5:30 p.m., EMT Kauffman placed a phone call to an Emergency Department to inquire about the physiological effects of ingesting isopropyl (rubbing) alcohol. EMT Kaufman informed the medical personnel consulted that he was present with an individual who had recently consumed approximately *a bottle* of isopropyl alcohol, and that he needed to

know whether that consumption presented a medical situation warranting assessment at the Emergency Department.

13. The medical personnel consulted advised EMT Kauffman that a person who had ingested *a bottle* of isopropyl alcohol did not need medical assessment by a physician and should not have a medical problem as a result of ingesting that amount of isopropyl alcohol.

14. In fact, isopropyl "rubbing" alcohol is a toxic poison not fit for human consumption, the lethality of which can occur at less than the approximately one-half bottle (8 ounces) to one bottle (16 ounces), which amount Karr was known to have consumed. Medically, it is 2.5 times more toxic than the ethyl alcohol which is the type contained in beverages that are designed for human consumption. Death does not result from an otherwise lethal dose of isopropyl "rubbing" alcohol when necessary medical treatment is timely administered.

15. EMT Kauffman informed Officers Osterquist and Mertes that he had received direction from medical personnel at an Emergency Room that Karr did not need to be transported to the Emergency Room for assessment. EMT Kauffman and his partner, Adam Schroeder, in reliance on the medical personnel's assurance that Karr's ingestion of isopropyl alcohol did not require medical evaluation or treatment and, after advising the police officers of the medical advice received, left with the ambulance shortly thereafter, leaving Karr with Officers Osterquist, Mertes, and Henkel.

16. Officers Osterquist, Mertes, and Henkel, relying on the EMTs' reiteration of the medical advice received and believing based thereon that Karr's physical medical condition was of no concern, shifted their attention entirely to Karr's emotional state. They suggested to Karr that they contact the Mobile Crisis Team (MCT) for assistance assessing her current mental

condition, and Karr agreed with this course of action. Jean Maag of MCT agreed to meet with them at the Minnehaha County Jail to assess Karr's emotional status in light of her admission of a suicide risk.

17. At approximately 5:33 p.m., Officer Mertes handcuffed Karr's hands behind her back and placed her into his custody in the back seat of his Sioux Falls Police Department squad car to transport her to the Mobile Crisis Team assessment location on the second floor of the Minnehaha County Jail. At the time Karr was initially taken from the scene, she was clearly displaying emotional distress, however her speech remained easily understandable and she was able to walk on her own in relatively unimpeded fashion. During the drive to the jail, Karr displayed signs of increasing toxicity and grew quiet. At approximately 5:42 p.m., she tried to relate facts about some football games going into overtime, but was unable to recall what she was going to say about one of the teams in the middle of her sentence. Karr's speech became noticeably slurred and her thought processes progressively more disjointed. Karr's substantial difficulties in communicating at this point in time were an indication of her increasing level of toxic poisoning from rubbing alcohol which the officers believed was ordinary intoxication.

18. At approximately 5:46 p.m., Officer Mertes arrived at the Minnehaha County Jail with Karr and helped her out of the vehicle. By this point in time, Officer Mertes observed that Karr was having difficulty maintaining her balance. Officer Mertes administered a portable breath test (PBT) at this time, which showed a reading of 0.144. The PBT unit utilized was an Alcosensor III by Toximeters, Inc.

19. Officer Henkel joined Officer Mertes and Karr in order to assist in taking Karr to meet with MCT. Karr's physical and mental condition had both markedly deteriorated by this

time. In the elevator on their way up to the second floor, Karr was displaying extreme toxicity as evidenced by the onset of a substantial deterioration in her physical condition to the point where she was unable to control her movements. She was giggling and slurring her words, she fell up against Officer Henkel, and was having trouble maintaining her balance without assistance, even when leaning on a fixed object.

20. Between approximately 5:46 p.m. and 6:00 p.m., Jean Maag from MCT met with Officer Mertes, Officer Henkel, and Karr who was by then "extremely unsteady on her feet and clearly intoxicated." Yet, Karr's condition continued to deteriorate even further. Jean Maag then attempted to interview Karr in the presence of the Officers, but Karr "... was unable to clearly communicate" sufficiently to continue the interview due to Karr's severe and escalating level of toxic poisoning. Maag was unable to complete MCT's mental/emotional/suicide risk assessment due to Karr's marked incoherence. Maag contacted the Detox Center to obtain a bed for Karr. Jean Maag later stated to Sargeant Walsh in his investigation of this incident, that "the longer she [Karr] sat there, the drunker she was getting."

21. Shortly before 6:00 p.m, Officers Mertes and Henkel took Karr from MCT to the Detox Center located in the same building. By this time, Karr was completely physically disabled. She was barely able physically to ambulate, even with assistance, and actually stopped in the hallway and slumped down on the floor into a sitting position. Officer Mertes retrieved a wheelchair, and together with Officer Henkel, lifted Karr into the wheelchair to wheel her to the Detox Center. Officer Mertes later recounted Karr's act of sitting down in the hallway to Sergeant Walsh as Karr seeming "... as though she couldn't move her legs."

22. Sarah Molloy, LPN; Amber Sturgeon, Detox Technician; Stephanie Theobald, Detox

Technician; and Julie Hagen, BPN (collectively referred to herein as "Detox Center Caregivers") are trained and licensed to provide competent and appropriate medical care and monitoring for persons admitted to the Minnehaha County Detoxification Center.

23. At approximately 5:54 p.m. (5:59 p.m. per Detox Surveillance), Karr was wheeled into the Detox Center in the wheelchair. The deterioration in her condition by this time was so severe from the rapidly increasing poisoning effects of the rubbing alcohol that she was not only unable to stand under her own power, but also could not even hold her own head up. She was slumped over in the wheelchair, and was at most semi-conscious or perhaps unconscious. Detox Technician Stephanie Theobald, recognizing that Karr was displaying extraordinary medical conditions beyond that expected with normal excessive ethyl alcohol intoxication, questioned whether Karr had a history of Parkinson's or Multiple Sclerosis because of the way her head was noticeably "lolling around."

24. Upon arriving at the Minnehaha County Detoxification Center ("Detox Center"), Karr was showing obvious signs of medical distress and was, in fact, in danger of death by isopropyl alcohol poisoning from a known ingestion of what was a lethal dose.

25. Karr was observed by the Detox Center Caregivers to have been so severely disabled and unable to help herself that they could not complete her intake documentation which includes an assessment, questionnaire, and gathering of information, medical and otherwise.

26. Officer Mertes filled out the Law Enforcement Form which was part of the Detox Center admissions forms, indicating that "Karr drank rubbing alcohol and whiskey. PBT 0.144. Karr is unable to take care of herself," and provided this to Detox personnel. Upon information and belief, Officers Mertes and Henkel also provided information regarding Karr's reasons for

admission orally to the staff at the Detox Center. None of this information was reviewed by Detox Center Caregivers who treated Karr without knowing this information. [1]

27. Sarah Molloy, LPN; Amber Sturgeon, Detox Technician; Stephanie Theobald, Detox Technician; and Julie Hagen, BPN, work at the Minnehaha County Detoxification Center, in their capacities as LPN, detoxification technician, or BPN, respectively. Upon information and belief, each individually and collectively participated in the admission, assessment, and care of Karr on November 18, 2012 at the Detox Center as employees of CCS. CCS, at all times pertinent, provided nursing and medical care services to Minnehaha County, in the Minnehaha County Jail and the Minnehaha County Detoxification Center, through a contract with Minnehaha County for provision of such services. All such acts and omissions of CCS and its said employees as are described herein were under color of State law.

28. The duties of the Detox Center Caregivers include, but are not limited to, taking patient histories, ongoing monitoring of all patients, taking of vitals, accurate and timely charting for every patient, completing intake assessments, reviewing in detail all relevant information about patients' reason for admittance, patients' medical history, and other important information required for caring for each patient, inter alia. The overreaching objective of the Detox Center Caregivers' duties is to provide ongoing monitoring and assessment at regular intervals of each patient's medical condition, determine each patient's medical needs, and provide necessary medical care as needed at the Detox Center, or if such care cannot be provided at the Detox

---

[1] BPN Julie Hagen stated to Sergeant Walsh in his investigation of this incident, that she would have contacted the on-call physician had she realized that Karr had ingested rubbing alcohol rather than regular ethyl alcohol. She had, however, been provided with this information by the Police Officers, but failed to check the patient file and history or properly utilize the relevant critical information in order to provide appropriate medical care to Karr.

Center, taking such action as is necessary to procure the appropriate medical care required by the patient.

29. As caregivers who specifically serve patients who have been admitted for excessive drug or alcohol ingestion (or other intoxicants, including overdoses thereof), the Detox Center Caregivers have the duty and obligation to monitor patients closely and regularly, to recognize and act upon the danger signs of alcohol poisoning and overdose, to recognize and act when it is appropriate to contact a doctor, to recognize and act when a patient is beyond the capabilities of their facility, and to either directly provide necessary and competent medical care, or timely refer patients out to facilities that will.

30. Shortly after Karr's arrival at the Detox Center at 5:54 p.m. (5:59 p.m. per Detox Surveillance), and in light of her worsening condition, before placing her in an observation room, a second PBT was administered by Detox Center Caregivers to determine Karr's blood alcohol content in light of the loss of consciousness observed. The reading showed 0.146 (% by weight of blood alcohol), though Detox Technician Theobald opined that Karr's level of outwardly observable intoxication appeared to be far greater than what would typically be expected at a blood alcohol level (BAC) of 0.146. The initial intake could not be completed due to Karr's incoherence.

31. Karr's severe toxic poisoning rendered her substantially unconscious upon admission, such that she was unable to change her clothes into the Detox Center uniform. She also needed assistance just to remove her shoes.

32. Officers Mertes and Henkel took Karr into Observation Room 1, where they were joined by Detox Technician Stephanie Theobald (Theobald). Officer Mertes and Theobald

attempted to get Karr to stand up from her wheelchair and move to the bed in the room, but she was too disabled from toxic poisoning to rise to her feet, follow directions, or even communicate with them at this time. After struggling to get Karr to stand for a few moments, Theobald grabbed Karr by the back of her pants and, assisted by Officer Mertes, lifted Karr out of the wheelchair used to transport her, and laid her face down while she was unconscious, physically helpless, and unresponsive, on the the bed in Observation Room 1 of the Detox Center. This occurred at approximately 6:02 p.m. Theobald then took Karr's vitals and left the room, leaving Karr alone face down on the bed.

33. Minnehaha County Detox Policy and Procedure Manual: Policy & Procedure and ARSD 46:05:18:07 indicates that when a patient (like Karr) is placed in observation, notes are to be made regarding the reason for placing them in observation, including a notation regarding whether the door was locked or unlocked. Furthermore, ordinary patients placed in observation must be checked on at least every 30 minutes; whereas, under said Manual and ARSD 46:05:18:07, unconscious patients (like Karr) for whom an intake cannot be completed are required to be checked on at least every 15 minutes, and medical charting must be completed to document that this has been done. This was not done or attempted prior to Karr's death even though it was required by law.

34. Karr can be seen in the surveillance video laying on the bed face down, occasionally struggling as if trying to reposition herself unsuccessfully for the next ten minutes. At 6:12 p.m., Karr's right leg falls off the bed.

35. Between 6:12 p.m. and 6:18 p.m., Karr can be seen on surveillance clearly struggling to breathe; she can be seen lifting her head up and down as if attempting to gasp for air. At

approximately 6:18 p.m., Karr took her final breath, became still, and at that time or shortly thereafter, died.

36. Approximately two and a half hours later, for the first time since Karr had been deposited face down on the bed, a CCS employee, Amanda Sturgeon, Detox Technician, opened the observation room door to check on Karr at 9:36 p.m. Karr failed to respond. Sturgeon approached Karr to check for breathing or a pulse. When Sturgeon found neither, she contacted staff nurse Sarah Molloy to assist, and called 911 to page Sioux Falls Fire and Rescue and Rural Metro Ambulance.

37. Numerous EMT's, Fire and Rescue personnel, and officers from the Sheriff's Department responded to the call. Life-saving efforts were employed, but Karr was ultimately declared to be dead on arrival. Various witness statements cited the fact that at the scene, Karr's jaw was already immovably clenched shut preventing establishment of an airway, her body had started to turn purple, and her arms were cold to the touch when she was found.

38. Karr's body was transported to the morgue at Sanford hospital, and an autopsy was performed on November 19, 2012 at 8:45 a.m. The cause of death was found to be a lethal dose of isopropyl alcohol.

39. After Karr's death, the Detox Center Caregivers, who had failed to keep their charts as required, attempted to construct the charting that should have already been completed. Knowing they had violated the required safety procedures and knowing the Detox Center was still on probation for previous similar infractions, they logged safety actions which indicated compliance with monitoring procedures and reported, in response to Officers' inquiries, that checks had been completed as required. These fabricated medical charting notes were later

scratched out and corrected. Karr was, in fact, never monitored or examined after being placed face down on the bed in Observation Room 1.

40. The conduct of the said Detox Center Caregivers as described above constitutes negligence, gross negligence, recklessness, and willful and wanton misconduct. Further, their conduct demonstrates a deliberate disregard and indifference to the standards of care, safety protocols, and rules that the law provides, when reasonable caregivers in the same or similar circumstances are required to provide, and to the constitutional right of Karr to have received necessary medical care and treatment while in custody. This conduct was the direct, proximate, and legal cause of the suffering and death of Karr and was the moving force behind the deprivation of Karr's constitutional right to necessary medical care and treatment.

41. Karr's condition, toxic overdose of isopropyl alcohol, was easily treatable with timely and proper medical care, and her death while under the complete care and control of the Detox Center and the four named employees thereof would not ordinarily have occurred but for the negligent, grossly negligent, reckless, and deliberately indifferent conduct of the said Detox Center Caregivers. Karr was entirely helpless and under the complete control of the County, CCS, and the said four Detox Center Caregivers. Had the said four Detox Center Caregivers observed the rules set forth above and applied the monitoring, knowledge, and care that a reasonable Detox Center Caregiver is expected to know and provide, Karr would have recovered from her poisoning alive and without injury.

42. The County and CCS both have a duty to train and supervise Detox Center Caregivers to ensure they are adequately prepared and educated to act in accordance with, and that they are actually complying with, the standards imposed by the Administrative Rules of

South Dakota governing detoxification centers to ensure that necessary medical care is provided.

43. The Minnehaha County Detox Center had recently been placed on probation by SD DSS for shortcomings in its performance in meeting standards set forth in the Administrative Rules of South Dakota (ARSD) 46:05. These shortcomings included insufficient assessment and charting of vital signs, insufficient staff training pertaining to medication administration procedures and documentation, and insufficient completion of a two-step tuberculin test for new employees, inter alia.

44. Having been placed on notice of the issues recited in paragraph 43 above, Minnehaha County, the Detox Center, and CSS should have been closely supervising the employees who are charged with carrying out these important duties.

45. A person (including, specifically, Karr) who is under the care, custody, and control of the County, or CCS, or any of the four Detox Center Caregivers named herein has a right to receive necessary medical care from such custodial "person." This right is granted by Due Process under the Fourteenth and Fourth Amendments to the Constitution of the United States of America.

46. On and before November 18, 2012, it was completely foreseeable to the County, CCS, and the four Detox Center Caregivers, and they all had actual knowledge that, a subset of its Patients who arrived at the Detox Center in a toxic and overdosed state, would require a level of medical care which necessarily included appropriate medical assessment and diligent medical monitoring according to recognized standards and practices, and that furthermore, some such cases would require (as in the instant case of Plaintiff's Decedent, Charleen Karr) emergency life-saving care or emergency transport to an emergency room trauma center for emergency medical

care in order to avert life threatening medical conditions. Further, that in conjunction therewith,

CCS was required to have Policies, Customs, or Usages in effect which were sufficient to guide

personnel in carrying out these functions; further, that providing such constitutionally required

necessary medical care required at a minimum:

> A. Investigating and knowing the substances ingested and their toxicity before assuming detoxification was the necessary medical treatment required;
>
> B. Assessing vital signs not only initially, but more frequently (and at least every fifteen minutes) when the substance and its toxicity (as in the instant case of Karr) cause unconsciousness and have the potential to quickly and adversely affect vital bodily functions, or threaten the life of the Patient;
>
> C. Knowing and determining when and under what conditions and circumstances (as in the instant case of Karr), reasonable medical treatment consists of administration of life saving emergency medical procedures, whether at the Detox Center or which necessarily (as in the instant case of Karr) require transport to an emergency trauma center; and
>
> D. Actually providing the appropriate necessary medical care or seeing to its provision.

47. Those rights obligate these "persons" when acting "under color" of State law to not

be "deliberately indifferent" to the provision of these constitutional rights.

## FIRST CAUSE OF ACTION
## MINNEHAHA COUNTY and CCS - 42 U.S.C. § 1983
## POLICY, CUSTOM, OR USAGE WHICH WAS DELIBERATELY INDIFFERENT TO KARR'S CLEAR AND WELL-ESTABLISHED / WELL-KNOWN CONSTITUTIONAL RIGHT TO RECEIVE NECESSARY MEDICAL CARE WHILE IN CUSTODY, CARE, AND CONTROL OF THE COUNTY AND CCS

COMES NOW the PLAINTIFF, BETHANY KARR, as the Special Administrator of the Estate of Charleen Karr, on behalf of the Estate, and on behalf of the Next-of-Kin of Charleen Karr, Deceased, by and through her attorneys, Nasser Law Offices, PC, and for her first cause of action against Minnehaha County and CCS, complains and alleges as follows:

48. That Plaintiff hereby re-alleges every allegation, matter, and thing herein-above contained and set forth as if the same were contained and set forth herein.

49. The County and CCS are each a "Person," under 42 U.S.C. § 1983 and as at all times pertinent hereto and hereinafter described, were acting under color of State law.

50. On November 18, 2012, Karr was placed by the Sioux Falls Police Department into the care, custody, and control of the County and CCS at the Detox Center.

51. As a person and Patient under the care, custody, and control of the County and CCS, Karr had a constitutional right under the Fourteenth and Fourth Amendments (Due Process) to the Constitution of the United States of America to receive and have the County provide Karr's necessary medical care. This right was, as of that time, clearly-established and well-known to the County and CCS.

52. Affecting the provision of such care was a County Policy, Custom, or Usage promulgated by the County Commissioners and other County and CCS officials charged with making final Policy for the County and CCS, respectively (County and CCS). The said County

and CCS well knew that CCS, in operating the Detox Center for months prior to November 18, 2012, was routinely and habitually out of compliance with the patient safety practices and procedures required by law and by accepted safe-patient standards of care, such that necessary medical care of Patients at the Detox Center was being denied or foreseeably in danger of being denied. The Detox Center, at all times pertinent hereto, was known by the County to be "on probation" by the State of South Dakota for such improper withholding of necessary medical care.

53. One of the documented items of deficiency was failure to regularly "monitor" patients in the care of the Detox Center. The County and CCS, though fully knowledgeable of such threats to constitutional rights, did not take decisive action to eliminate the infringement but, instead, allowed it to go on for months, hoping that State regulators would eventually solve the problem. This stance wherein the County and CCS, individually and jointly, with deliberate indifference to their non-delegable duty to provide necessary medical care and to the rights of Karr and others to receive it, allowed the seriously defective condition to continue. This abdication of responsibility formed and constituted an act of the County and of CCS rising to the level of a Policy, Custom, or Usage of each.

54. As of November 18, 2012, the County and CCS knew or should have known (as they had been informed just days earlier by the State of South Dakota - see Exhibit A) that, despite CCS's then on-going probation, the afore-described deficiencies in care still existed and were ongoing and that Patients presented to the Detox Center were (then) currently being subjected to such lack of necessary medical care.

55. As of November 18, 2012, even though the County and CCS knew that the Detox Center was rendering deficient medical care (as described above), it was also part of said continuing Policy, Custom, and Usage of the County, as formulated and implemented by the County and CCS, that County tax dollars on medical expenditures for drug and alcohol patients were to be conserved through continued, consistent use of the CCS-run Detox Center by Law Enforcement together with corresponding limited use of more expensive Emergency Rooms, Urgent Care Centers, and other treatment centers, despite the known risks of deprivation of patients' rights, including those of Karr.

56. Despite the fact that deprivation of constitutionally guaranteed rights to necessary medical care for Detox Center patients (and Karr, in particular) being completely foreseeable, the County and CCS, pursuant to their said such Policies, Customs, or Usages, remained "deliberately indifferent" to these risks and were so as of November 18, 2012.

57. Unbeknownst to Karr, that was the setting in which she would ultimately receive detoxification services from the County and CCS.

58. On November 18, 2012, Karr, when taken to the Detox Center by police, was experiencing a very serious medical condition (toxic poisoning) which was potentially fatal unless she received routine emergency medical care that assuredly would have been life-saving.

59. Instead of providing such life saving care or referring her to a suitable Emergency Room where it would have been provided, the CCS Caregivers, acting under color of State law and on behalf of the County, with deliberate indifference to Karr's critical medical needs, pursuant to the Policies, Customs, and Usages which had for numerous months prior thereto been

employed by the County and CCS in the handling of patients, withheld such life saving medical

care from Karr, and instead:

A. Failed to read the admission records from the Officers which clearly
   showed she had consumed unsafe isopropyl rubbing alcohol rather than
   consumable ethyl alcohol;

B. Failed to account for the variance between the reported relatively safe
   Portable Breath Tested ethyl blood alcohol readings (0.144 and 0.146) and
   the extreme symptoms of severe isopropyl poisoning, incoherence,
   complete loss of consciousness, and complete loss of bodily function and
   control they personally observed;

C. Admitted her to the Detox Center pursuant to the County's Policy, Custom,
   and Usage of diversion of patients from Emergency Room care to the
   Detox Center to save County Funds;

D. Provided no triage or medical treatment instead of referring her to an
   appropriate ER facility; and

E. Pursuant to the County's and CCS's said Policies, Customs, or Usages,
   which for months prior thereto had (by deliberate choice of the County
   and CCS) acquiesced in and continued to permit the ongoing and unlawful
   practices of CCS (regarding the withholding of medical care and failures
   to adhere to treatment protocols required by laws governing Detox
   Facilities), the Detox Center Caregivers withheld constitutionally required
   necessary medical care from Karr. They deposited her face down on a bed
   leaving her completely helpless, unconscious, unattended, unobserved,
   and unmonitored for 2 1/2 hours, deliberately ignoring all requirements of
   the law that an unconscious patient in Detox must be consistently charted
   and regularly monitored, observed, assessed, and treated.

60. Karr died at approximately 6:18 p.m. on November 18, 2012, or shortly thereafter.

She died because the County's and CCS's said Policies, Customs, and Usages caused an easily

foreseeable deprivation of necessary medical care that Karr was entitled by the Constitution to

receive from the County and CCS. Had the County and CCS not effected and sustained the said

Policies, Customs, or Usages herein-above described and set forth, Karr would not have died.

Accordingly, under color of State law, the deliberate indifference of the County and CCS in depriving Karr of her constitutional rights directly, legally, and proximately caused her suffering and death and was the moving force behind such loss, entitling Plaintiff under 42 U.S.C. § 1983 to the damages prayed for herein which prayer is incorporated herein by reference.

**SECOND CAUSE OF ACTION**
**MINNEHAHA COUNTY AND CCS - 42 U.S.C. § 1983**
**FAILURE TO TRAIN AND SUPERVISE DETOX CENTER PERSONNEL**

COMES NOW the PLAINTIFF, BETHANY KARR, as the Special Administrator of the Estate of Charleen Karr, on behalf of the Estate, and on behalf of the Next-of-Kin of Charleen Karr, Deceased, by and through her attorneys, Nasser Law Offices, PC, and for her second cause of action against Defendants Minnehaha County and CCS, complains and alleges as follows:

61. That Plaintiff hereby re-alleges every allegation, matter, and thing herein-above contained and set forth as if the same were contained and set forth herein.

62. On and before November 18, 2012, the County (through its County Commissioners and other County makers of final Policy) and CCS, through its makers of final Policy (collectively "County and CCS"), knowing fully of the clearly established Fourteenth and Fourth Amendment (U.S. Const.) constitutional obligation and duty to provide necessary medical care to Detox Center patients (specifically including Karr) under the care, custody, and control of the County and CCS while they are receiving Detox Services, and of the corresponding constitutional rights of such patients to receive necessary medical care, deprived such patients (and Karr) of their rights to such care by failing to adequately train and supervise the County Detox Caregivers who were charged by the County and CCS with furnishing such care as such

patients (including Karr) were entitled to receive.

63. The above described failure to train and supervise was done by County and CCS while acting under color of State law and with deliberate indifference to said constitutional duty and rights and was the moving force behind the deprivation of Karr's constitutional rights and her consequent suffering and death as described above.

64. The County and CCS, both knowing of CCS's probation and the on-going lack of necessary medical care being provided at the Detox Center., each failed to enact adequate Policies, Customs, or Guidelines to guide the four Detox Center Caregivers named herein in their required delivery of necessary medical care as herein-after set forth.

65. It was, as of November 18, 2012 and before, well known and completely foreseeable to the County and CCS, that a subset of patients who arrived at the Detox Center in a toxic and overdosed state, would require a level of medical care which necessarily included appropriate medical assessment and diligent medical monitoring according to recognized standards and practices including the Administrative Rules of South Dakota, and that some such cases would require (as in the instant case of Karr) emergency transport to an emergency room trauma center for emergency medical care in order to avert life threatening medical conditions. Further, that in conjunction therewith, Detox Center Caregivers knew or should have known that such constitutionally required necessary medical care included at a minimum:

> A. Investigating and knowing the substances ingested and their toxicity before assuming detoxification was the appropriate necessary medical treatment;
>
> B. Assessing vital signs not only initially, but more frequently (and, at least, every fifteen minutes) when the Patient is unconscious and the substance and its toxicity (as in the instant case of Karr) have the potential to quickly and adversely affect vital bodily functions, or threaten the life of the

patient;

C. Knowing and determining when and under what conditions and circumstances (as in the instant case of Karr), necessary medical treatment consists of administration of life saving emergency medical procedures, whether at the Detox Center or which necessarily (as in the instant case of Karr) required transport to an emergency trauma center; and

D. Actually providing the medical care found to be necessary or seeing to its provision elsewhere.

66. In light of the known on-going deficiencies and violations, the need (as of November 18, 2012) for more training was so obvious that the lack of enactment, formulation, and enforcement of policies, practices, rules, guidelines, or customs that addressed how, when, under what circumstances, and by whom these items of necessary medical care must be administered, and the utter lack of training with regard thereto, was so grossly negligent and reckless that the deprivations of constitutionally guaranteed medical care to Karr (on November 18, 2012), and to others similarly situated directly resulted from the County's and CCS's said deliberate indifference. This deliberate indifference constituted a Policy, Custom, and Usage of the County and of CCS.

67. The County's and CCS's above-described course of conduct was deliberately indifferent, grossly negligent, reckless, and shocking to the conscience; further, it constituted a continuing and ongoing Custom, Policy, and Usage of doing no more and no sooner than regulators compelled and was a moving force behind Karr's deprivation of her right to necessary medical care and her consequent suffering and death on November 18, 2012, entitling Plaintiff under 42 U.S.C. § 1983 to the damages prayed for herein.

## THIRD CAUSE OF ACTION
## DETOX CENTER CAREGIVERS - 42 U.S.C. § 1983

COMES NOW the PLAINTIFF, BETHANY KARR, as the Special Administrator of the Estate of Charleen Karr, on behalf of the Estate, and on behalf of the Next-of-Kin of Charleen Karr, Deceased, by and through her attorneys, Nasser Law Offices, PC, and for her third cause of action against Defendants, Detox Center Caregivers, complains and alleges as follows:

68. That Plaintiff hereby re-alleges every allegation, matter, and thing herein-above contained and set forth as if the same were contained and set forth herein.

69. On November 18, 2012, the Detox Center Caregivers (Amanda Sturgeon, Sarah Molloy, Stephanie Theobald, and Julie Hagen) as described above, knowing of the well-established constitutional right of Karr to receive necessary medical care while in the care, custody, and control of the County, CCS, and themselves, with deliberate indifference to her said rights and under color of State law, withheld necessary medical care from her in the manner set forth above.

70. Such deliberately indifferent deprivation of Karr's right to said medical care shocks the conscience and was the moving force behind Karr's suffering and death, entitling Plaintiff to damages under 42 U.S.C. § 1983 as prayed for herein which prayer is incorporated herein by reference.

## FOURTH CAUSE OF ACTION
## NEGLIGENCE of DETOX CENTER CAREGIVERS
## LIABILITY of CCS as EMPLOYER

COMES NOW the PLAINTIFF, BETHANY KARR, as the Special Administrator of the

Estate of Charleen Karr, on behalf of the Estate, and on behalf of the Next-of-Kin of Charleen

Karr, Deceased, by and through her attorneys, Nasser Law Offices, PC, and for her fourth cause

of action against Defendants, Detox Center Caregivers and CCS, complains and alleges as

follows:

71. That Plaintiff hereby re-alleges every allegation, matter, and thing herein-above

contained and set forth as if the same were contained and set forth herein.

72. The failure of the Detox Center (Caregivers) to follow the Administrative Rules

governing the providing of necessary medical care to Detox Center patients (including to Karr on

November 18, 2012), and the failure of said Caregivers to exercise the competence of reasonable

Caregivers under the same or similar circumstances, including but not by way of limitation:

> A. Failure to read their own intake charts and otherwise gather and acquire
> the essential information needed about Karr's toxic exposure to assess
> whether she can receive necessary medical care at the Detox Center or
> should be transferred elsewhere to receive such care;
>
> B. Failure to properly assess and know the risks and dangers attendant to Karr's
> poisoning;
>
> C. Failure to either administer such necessary life saving treatment called for or to
> transfer Karr elsewhere where she could receive it;
>
> D. Failure to recognize the nature and seriousness of Karr's condition so as to
> provide necessary medical care or referral; and
>
> E. Failure to monitor and observe Karr and to chart her progress making such
> assessments and adjustments to her care as she needed;

constitutes negligence.

73. CCS is vicariously liable under the doctrine of respondeat superior for the negligent acts and omissions of the Detox Center Caregivers as its employees who were acting within the course and scope of their employment.

74. The said negligence of the Detox Center Caregivers and CCS caused Karr to be deprived of the lifesaving medical treatment she had been seeking when she called 211 for help, thereby directly, legally, and proximately causing Karr's suffering and death at the Detox Center, entitling Plaintiff to compensation for the injuries, harms, and losses herein prayed for which prayer is incorporated herein by reference.

## FIFTH CAUSE OF ACTION
## NEGLIGENT TRAINING AND SUPERVISION
### as to CCS

COMES NOW the PLAINTIFF, BETHANY KARR, as the Special Administrator of the Estate of Charleen Karr, on behalf of the Estate, and on behalf of the Next-of-Kin of Charleen Karr, Deceased, by and through her attorneys, Nasser Law Offices, PC, and for her fifth cause of action against Defendant CCS, complains and alleges as follows:

75. That Plaintiff hereby re-alleges every allegation, matter, and thing herein-above contained and set forth as if the same were contained and set forth herein.

76. CCS was employing the named Detox Center Caregivers to provide safe necessary medical care for patients of the Detox Center and had the obligation to make certain the named Detox Center Caregivers were properly and adequately trained to perform such tasks and supervised in the performance of such tasks. CCS failed to do so, and this negligent failure was a legal, proximate, and direct cause and cause in fact of Karr's above-described suffering and

death and the damages, losses, and harms enumerated in the Plaintiff's prayer which is incorporated herein by reference.

WHEREFORE, the Plaintiff hereby prays for Judgment in favor of the Estate and Next-of-Kin of Charleen Karr, Plaintiff's Decendent, and against the Defendants above-named as follows:

1. Costs, Disbursements, and Reasonable Attorneys Fees;

2. Prejudgment interest;

3. Under Karr's 42 U.S.C. § 1983 claims, the compensatory value of the injuries, harms, and losses caused by the violation of Charleen Karr's Due Process rights under the Fourteenth and Fourth Amendments to the Constitution of the United States of America in such amount as shall be proven at trial, including but not by way of limitation, for the pecuniary losses suffered by her Next-of-Kin as a result of her wrongful death and the pain, suffering, mental anguish, and loss of enjoyment of life Karr suffered in her final hours, which damages survived her death and are due her Estate;

4. Under Karr's 42 U.S.C. § 1983 claims, exemplary damages in such amount as the jury shall deem just and equitable under the circumstances for the Defendants' deliberate indifference towards and their reckless wanton and reckless disregard of Decedent Karr's rights to receive necessary medical care under the United States Constitution;

5. Under Karr's State law negligence claims, the compensatory value of the injuries, harms, and losses caused by the negligence of the Defendants as above-stated and set forth, in such amounts as shall be proven at trial, including but not by way of limitation, for the pecuniary losses suffered by her Next-of-Kin as a result of her wrongful death and the pain, suffering, mental anguish, and loss of enjoyment of Life Karr suffered in her final hours, which damages survived her death and are due her Estate; and

6. Such other and further relief as the Court shall deem just and equitable in the premises.

Dated and signed this 13th day of November, 2013.

NASSER LAW OFFICES, P.C.

N. Dean Nasser, Jr.
James M. Nasser
Jolene R. Nasser
204 South Main Avenue
Sioux Falls, SD  57104-6310
Telephone:  (605) 335-0001
Facsimile:   (605) 335-6269
Email: dean@nasserlaw.com
           james@nasserlaw.com
           jolene@nasserlaw.com
*Attorneys for Plaintiffs*

## PLAINTIFF'S DEMAND FOR TRIAL BY JURY

The Plaintiff hereby demands a trial by jury on every issue of fact properly triable to a jury.

Dated this 13th day of November, 2013.

NASSER LAW OFFICES, P.C.

N. Dean Nasser, Jr.